[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action by the plaintiff husband against the defendant wife for the dissolution of their marriage on the grounds of irretrievable breakdown. The wife has brought a cross-complaint on the same grounds. The parties were married in Goshen, Connecticut, on September 21, 1980, and have three minor children issue of the marriage — Sylva, age 17, Timothy, age 14, and Magdalen, age 11. The husband is 48; the wife is 49. Both are college graduates and in good health. The parties have been separated for 2 years.
The parties, each of whom was represented by counsel, appeared at trial and testified over numerous days. The court observed their demeanor and evaluated their credibility. No other CT Page 11696 witnesses were called. Specifically, no expert testimony was offered regarding the value either of the various businesses the parties conducted or of the real property and no expert testimony was proffered with regard to the accounting practices — past or present — they employed vis-a-vis business deductions claimed for federal and/or state income tax purposes or for the purpose of determining child support obligations. Numerous exhibits were introduced, virtually all related to financial issues — i.e., business profit and loss statements and business and personal federal tax returns. Each submitted a sworn financial affidavit, proposed findings of fact, and proposed orders. The principal issues are the distribution of the real and personal property, the extent, if any, of the continuing interest of Mr. Zander in his wife's music business, and the amount of the wife's earnings available for the purpose of child support. The court is aware of a pending motion to modify custody. By earlier agreement between the parties, they are to have joint legal custody with physical residence with the father. At trial, it was unclear whether that motion would be pursued by way of a formal custody evaluation. In any event, custody was not contested in this proceeding and the parties agreed the present arrangement should be preserved.
The husband is a self-employed mason who builds and sells soapstone stoves through a company known as New England Hearth and Soapstone (NEHS); before that, he did woodworking through a business called The Artisan's Woodshop (TAW). NEHS is a moderately successful business.[1] The wife is a self-employed folk singer and musician who performs at concerts and sells her recordings on cassette tapes and discs. Her business is conducted through a company known as Molly Gamblin Music (MGM). Half of her income comes from concerts and the other half from tape sales. At no time has MGM been more than marginally successful.[2] The parties jointly conducted their businesses — TAW, NEHS, and MGM through a partnership called Altera. Each has a 50% interest in Altera. At all times, they maintained separate financial records for each company operating through Altera.
The parties are now entirely estranged with little in common except the children. Not only are their interests antagonistic but they are hostile to each other. He asks to keep all that he already has and then lays claim to that which she has to give while she asserts she has pitifully little to offer. In truth, their estrangement began shortly after the children were born when her activities centered on her caretaking responsibilities for the children and the home and he focused on his work and CT Page 11697 house renovations. Tension arose over their differing parenting styles and it increased when, as the children grew older, the wife resumed her work as a folk singer and, from time to time, traveled out-of-state. Despite the husband's declarations at trial that he supported his wife's career, in fact he did little to support her short of being present at four to six meetings with recording industry representatives. On occasion, the entire family traveled with her on tour (because she breast-fed) and he did not challenge her claim he failed to attend to the children even as she performed. Nor did he refute her testimony that, when she toured and left him at home with the children (who were then in school), he often gave her the silent treatment for two or three days before she left and after she returned home. He admitted he resented her inability to make a greater financial contribution to the family yet he failed to support her in ways that frustrated her commercial success. As their ability to communicate deteriorated, she developed interests outside the home — i.e., improvisational dance and the healing arts — and he spent more time alone in bed, reading and watching t.v. While he claimed her reading of a book entitled Uncoupling in 1997 was instrumental in her decision to leave the family home, it is clear the parties had been "uncoupling" for many years, and, though they had been in counseling for a number of years, they were unable — or unwilling — to confront — and thus to resolve — their problems. Each had sexual relationships outside the marriage prior to the wife's leaving. He admitted to such a relationship with Debbie Lewis and Jan Wallsmith (The defendant did not learn of the Wallsmith affair until discovery in this proceeding began.). Though she denies any sexual relationships with others before she moved out, the better evidence is that she also had two lovers — David Sharpe and Dana Robinson. While these relationships contributed to the breakdown of the marriage and undermined the vitality of the family unit, they were not the primary cause of the breakdown.
It is true that, when the wife moved out, she moved to Ashheld, Massachusettts, and rented a portion of the home of Dana Robinson, a fellow musician and her then romantic interest. Despite that, Mr. Zander's claim she "abandoned" the marriage to live with her lover is unfounded. Mr. Zander had previously announced he was leaving the home because he found the atmosphere there intolerable though he changed his mind days later. Then he told her — in July of 1997 — she was to move out when she returned from touring and he had her bags packed when she came home. Both agree that, when it was clear one of them had to move, CT Page 11698 it made better sense for him to remain where his business was and that the children remain with him since she intended to continue her career (In fact, she had never had any other career.) and that meant continued travel. Also not credible is the wife's claim she left because he invaded her privacy by reading her e-mail and diary (which he admitted) and the court also rejects her assertion she left because intimidated by such acts as his thrusting of a knife into a cutting board in her presence and his shaking of a ceramic pitcher in her face. No time frame was offered with regard to these acts and the court cannot conclude they produced in her such a fear as to motivate her leaving. While the husband kept rifles and ammunition in the home, it is not known whether they were kept loaded or in an unlocked place and there was no evidence he ever threatened their use or displayed them in anger. Though Mr. Zander admitted to shooting out a street light on two occasions because the light shone into his bedroom and "was very disruptive to my sleep" (Tr. 5/26/99, p. 33) and though he also admitted he had once shot a neighbor's dog because it was bothering animals used to feed the family, these incidents — whatever they might say of Mr. Zander — occurred 10-15 years earlier and did not provide the impetus for the wife's departure. To be sure, the wife's frequent change of heart with regard to whether she wished to remain in a monogamous relationship with her husband and her lack of constancy regarding the nature and depth of her feelings for him were aggravating factors which served to diminish his sense of self and his security in the marriage, encouraged his moodiness, and appeared to deepen a longstanding problem with depression. Yet, the primary cause of the breakdown was their inability to communicate, the absence of shared interests, and increasing tensions within the home.
REAL PROPERTY
In 1979, the parties bought a home in Goshen and paid $40,500. Mr. Zander put down $8,100 and they got a mortgage on the remaining amount based on the strength of her credit history. The house is in both their names. When purchased, it required a great deal of work and the couple began immediately to undertake significant repairs though the bulk of the labor was provided by the husband. The property also included a barn the plaintiff thereafter used to house woodworking and masonry equipment and materials. Mr. Zander gutted portions of the home, added insulation, restored chimneys, rebuilt windows, etc. As the children were born, the wife contributed less effort to the home CT Page 11699 project as she became the primary caretaker of the children and performed the housekeeping and cooking functions. The husband worked in his woodworking (later, his masonry) business and cut the firewood and did the plowing. Mrs. Zander, who had been a folk singer and musician since before the marriage, stopped performing for approximately 1 1/2 years when Timothy was born and, for the following 1 1/2 years, performed only frequently. Timothy was born with a club foot and that condition required concentrated medical care and subsequent out-of-state surgery. Both parents were attentive to the child's problem and demonstrated a commitment to doing all that was required with the result that Timothy is today a healthy teenager with only minor medical sequellae. Mr. Zander's work on the home and the outdoor structure have continued to the present though the house renovations are now considerably less expansive and the construction of what has become his shop appears complete. From the fall of 1997 to the fall of 1998, the husband made extensive changes outdoors. To the existing 24 x 30 wood frame barn, he added a 22 x 40 stucco building which stands 18 feet tall and which he uses today as a workshop and storage area. The couple refinanced the property approximately three times and there is now a mortgage of $55,500. Despite vast improvements, neither party values the property at greater than $160,000.[3] The property has never been on the market nor formally appraised. While it may be to seriously undervalue the site given its location and the attractiveness of the shop to an artisan or craftsman, in the absence of expert testimony suggesting otherwise, the court finds the value of the property to be $160,000. The equity is therefore $104,500.
At the time of purchase, the parties orally agreed that, should they split or should the property be sold, the husband's initial investment would be returned to him. The wife recalls the agreement was that he would receive the first $8,100 of the net proceeds and the remainder would be evenly divided. His recollection is that he was to receive the first 20% of the proceeds and the remainder would be divided as per the proportionate contribution of each to its present value (He later testified the agreement was that the remainder would be split 50/50.). At trial, however, his position was that the wife should receive no interest whatsoever in the realty since, in his view, she abandoned the home and family and contributed little to its value.
Relevant to this court's determination of the equitable CT Page 11700 distribution of this property is that the wife moved out in August of 1997 and that the husband still lives there with the three children. His business is conducted there. The wife has no interest in the property being put on the market since the children have known no other home. It appears clearly the husband's intention to remain there. Also relevant to the court's determination, however, is the wife's role in her husband's business since her contribution freed him to continue his work on the property and in his trade. Up until the time she moved out, Mrs. Zander kept the books for each of the three businesses, which task consumed approximately 15 hours per week. She also met with their accountant and gathered the data preparatory to the filing of tax returns, designed customer proposals and contracts and customer intake forms, sometimes handled the telephone and setup appointments, and had occasional contact with suppliers and manufacturers. In connection with her record keeping function, she completed a course at a local university in accounting for small businesses and became active in her husband's trade organization, the Masonry Heater Organization. One year she served as that group's treasurer and successfully worked to regain the organization's tax exempt status. While she agrees the family benefitted [benefited] from her husband's income, her various contributions — for which she received no remuneration — freed him to concentrate on doing the work from which he derived greater satisfaction and relieved them of the need to hire a bookkeeper or business manager, thus preserving family funds for home restorations, etc. Considering all of the above as well as the length of the marriage, it is a fair and equitable distribution of the property to award Mr. Zander the first $8,100 of the equity (leaving an equity of $96,400) and 60% of the remainder — or $57,840 — and the remaining 40% — or $38,560 — to Mrs. Zander.
INTEREST IN BUSINESSES
Despite the contributions made by the wife to her husband's companies (TAW and NEHS) over the almost seventeen years they resided together, she testified she believed NEHS should remain exclusively his — and the court agrees.
Mr. Zander, however, at trial and in his proposed orders asks he be awarded 50% of all future royalties from the sale of her recordings and 50% of the "net proceeds" of MGM. At times, he testified his entitlement was based upon his support of her career (i.e., his caring for the children as they grew older and CT Page 11701 she traveled for concerts) and the fact that marital monies were expended to produce the recordings. It is in fact so that the wife segregated a portion of her income to bring back into circulation "old" recordings. Accepting as true all of Mr. Zander' s arguments, it is here relevant to note the husband made similar use of marital income to fund his business. Mrs. Zander's use of family income in that way is no less legitimate a use than was Mr. Zander's 1997 expenditure of $9,000 for NEHS brochures or the expense incurred to take a two-week trip to Sweden for a masonry convention — and surely it is a far more legitimate use than the husband's extending of that European trip one week to visit a friend in Switzerland or his setting aside of an unspecified sum and his keeping of a small trailer so that he could always leave the marriage if he so chose (Mr. Zander did not challenge this testimony.). In January of 1997 — seven months before the couple separated, the marital property was re-financed for $60,000 — $20,000 of which was earmarked to enlarge and modernize his shop (His testimony was that $7,000 was used to pay household debts and $13,000 was used in the shop construction.). Whatever amount he used in his business is greatly in excess of that which she used to keep MGM alive. He borrowed against their mutual asset (the home) for an asset which is exclusively his (NEHS) and then proposes she get no interest in the realty. Nor does he suggest there be a corresponding deduction from whatever interest in the property he is awarded. The court is unpersuaded by his arguments.
Mr. Zander was clear he was asking for 50% of the royalties and net proceeds from MGM not as child support but for himself and for so long into the future as they continued to be paid (presumably beyond her death). The practical effect of this would be to award him alimony — non-modifiable in term and, unless the court were to designate these payments as "alimony," they would not be reportable as income to him nor tax deductible by her. There is no basis to award the husband alimony when her gross income from all sources for the period 1993-1998 was less than half that of her spouse ($206,174 as compared to his $424,362).
Finally, the recordings in question have no value unless the wife continues to actively market them. This case is unlike the royalties paid an artist for each airing of a t.v. commercial or re-print of a cartoon and unlike an inventor paid a royalty for each sale of a product whose patent he holds since, in each of these cases, the "creator" is not himself required to do anything beyond the original act to cause royalties to be paid. Here, the CT Page 11702 defendant wife sells only as many recordings as she both markets (by way of concerts, air time, etc) and causes to be physically produced. She must continue to invest her time, physical efforts, talent, and money to ensure the royalty stream. The term "marital property" ought not be so broadly construed as to embrace under circumstances as here presented the efforts of a spouse long after a dissolution, thereby enriching the passive partner and penalizing the active one.
A fair and equitable distribution of the assets of MGM requires the defendant retain sole interest in the company to include future royalties and net proceeds free of any claim by her husband.
CHILD SUPPORT
On April 1, 1998, the parties, each represented by counsel, appeared before the Honorable Michael R. Sheldon and put on the record an agreement that Mrs. Zander, as the non-custodial parent, would pay Mr. Zander $127.20 per week in child support. While Mrs. Zander's testimony here was that she believed even then she could not afford to pay that amount, she was canvassed by Judge Sheldon, indicated she understood all that the parties had discussed and that she wished the terms be made an order of the court. Tr. 4/1/98, pp. 8-9. Part of the order was that any child support arrearage on the date of dissolution would be assessed (as a penalty) at 125%[4] On November 9, 1998, the wife filed a motion for modification of child support and, on 3/11/99, a hearing on that motion was deferred by the Honorable Alexandra DiPentima to the time of trial.[5] The parties are agreed any modification ordered by this court shall be retroactive to November 9, 1998.
Mrs. Zander claims her 1998 gross income for child support purposes was $11,213 which, when a deduction for social security self-employment taxes is taken (12.4% of $2,118), produces a net yearly income of $10,950.37 — or a net weekly income of $210.58. Plaintiff urges the court find certain business expenses deducted inappropriate (i.e., recording costs, deductions for food while on the road, etc.). Plaintiff additionally urges independent contractor costs deducted be disallowed either because not claimed in prior years (There was evidence the defendant and Mr. Robinson — the independent contractor — performed together in 1998.) or because Mr. Robinson and the defendant continue even this date to be sometimes lovers. While the court would have CT Page 11703 wished the wife had done more than she did to increase her earnings and better provide for her children, this court cannot, in the absence of expert testimony to support a finding of the availability of greater income to the defendant, substitute her judgment with regard to what constitutes "legitimate" business expenses.[6] The husband had available to him the means to prove that claim but failed to do so. He does not, in his findings of fact or in his proposed orders, request the court deviate from the guidelines and the court does not find there exists the basis for such deviation. At argument, however, plaintiff argued the wife had an earning capacity greater than current income. While that may in fact be so, this court cannot so find without, for example, any evidence as to what someone who received a B.A. in sociology some twenty-five years ago and who has never been employed in that field could today earn. Similarly, this court cannot properly assess the earning capacity of a person who took one accounting course at a community college and whose only experience as a bookkeeper is to have kept the books of a family business for seventeen years. The court is without any basis to determine the market value of someone with Level II training in Reikian therapy (a healing modality) as this defendant had and has no evidence whether there is any demand in the teaching field for someone like Mrs. Zander who twenty or more years ago spent six months as a substitute teacher of music. Tempting as it may be to characterize this defendant as a free spirit who has, for the past two years, avoided all parental responsibility to do with her life as she wished, it is to avoid the reality that this wife did not leave a more lucrative career to do that and she has never established an earnings history greater than she now presents. Nor has she — from the 1996 tax year to the 1997 tax year and during the pendency of this action — reduced her gross earnings by more than 50% or show net weekly income for child support purposes of approximately $1,000 less in April of 1999 than was shown in December of 1997,[7] and then attempt to legitimize it by, for example, returning to school for a degree in music theory or constructing a sound studio. Mr. Zander can't now suggest the wife should pay more than the guidelines provide merely because her employment — both before and during the marriage — did not realize a level of earning that would dictate a greater child support obligation.
Mrs. Zander's 1999 gross income from January through March was $10,812.65 (Defendant's Exhibit 6). Her financial affidavit of 4/20/99 showed a gross weekly income of $267.00 and a net weekly income of $217.57. Under the new guidelines, her child CT Page 11704 support obligation is $56.00 per week.
The child support order is modified to $48.00 per week (as per the guidelines) retroactive to 11/9/98 and $56.00 per week as of 8/31/99. Under Judge Sheldon's order, total child support owed for the period 4/1/98 — 11/9/98 is $4,070.40 (32 weeks x $127.20); child support paid was $1,664.80 for the same period.[8] The arrearage ($2,405.60) plus the penalty (125%) equals a total of $3,007.00. For the period 11/9/98 — 8/31/99, child support owed is $2,016 (142 weeks at $48.00 per week); the amount paid is $2,168.[9] Application of a credit of $152 for this period results in total arrearage of $2,855 to the present. Mr. Zander's equity interest becomes $68,795 and Mrs. Zander's equity interest becomes $35,705.
HEALTH INSURANCE
Mr. Zander paid premiums for the childrens' medical insurance for the period 6/1/98 — 10/30/98 in the total amount of $454.24 (The policy was then dropped because the children were provided coverage under the Husky Plan and they continue to be so covered.). Under the order of 4/1/98, Mrs. Zander was to contribute 50% of these costs. The parties are agreed she paid that amount and there is no arrearage.[10]
UNREIMBURSED MEDICAL EXPENSES
Portions of the childrens' medical expenses were unreimbursed by any policy and the order of 4/1/98 required the wife pay 50% of those expenses. She made some such payments for the period beginning 8/1 5/98 and ending 2/15/99. There came a point in time when the husband made application for assistance to the Carlyle Fund (also known as the Caroline T. Brooks Fund) which provided payments for unreimbursed expenses incurred for the medical care of qualified children in the town of Goshen. Unbeknownst to Mrs. Zander until March of 1999, the father received direct reimbursements in the amount of $1,567.28,[11] none of which was shared with the wife.
Mrs. Zander's position at trial was that she should be credited for all amounts she paid for unreimbursed medicals and these amounts be credited toward child support payments and in lieu of any penalty assessment under Judge Sheldon's order since, she argued, she would have paid those amounts in child support had she known of reimbursements by the Carlyle Fund. The parties CT Page 11705 are agreed she is owed $82.47 for payments she made during the period covered by the court order. No additional credit for any amounts the husband received shall be applied as a credit to her since his reimbursements were often made many months after submission of the required documentation and often at times when the wife was either not making child support payments or making payments less than the court had ordered. There was no evidence monies the husband received for these expenses were used for other than the benefit of the children.
PERSONAL PROPERTY
Each party shall retain — to the exclusion of the other — all items of personal property currently in their possession except as is next here referenced.
The husband shall retain the refrigerator, gas stove, washer/dryer, lawn mowers(2), rototiller, full set of Saladmaster cooking pos, utensils, dishes, chest freezer, 20' wood and canvas canoe, stereo cabinet, and family photo albums. The wife shall retain the antique gathering basket, French cast iron cooking pot, and Swedish seal plate.
The husband shall have duplicated — at the wife's expense — all photos of family members in his possession — whether they be included in the photo albums or exist separately.
MISCELLANEOUS
1. Inheritance Fund
Mr. Zander inherited approximately $25,000 from his mother's wrongful death suit nine or ten years ago. The couple put that money into an account they referred to as the "Inheritance Fund" and intended it to provide for their retirement. They borrowed money from that account to purchase a 1995 Subaru Station Wagon for her and an 87 Chevy Suburban for him. Whatever amount was paid for the Subaru, the borrowed money was paid back. $1,700 was borrowed from the fund to purchase his Suburban, only $200 of which was paid back. Since it was the wife who handled the books and paid the bills, Mr. Zander claims, she could have — but did not — pay back the remaining $1,500 borrowed from the fund for his car; because the inheritance fund remains short that amount, he proposed she reimburse the fund by way of deducting that sum from her equity interest in the realty. The proposal is unsound — CT Page 11706 and hence rejected — for multiple reasons. Though it was his inheritance, it became a marital asset and, since intended to provide for both of their retirements, she has a claim to one-half of the fund. He had access to the books and to their business records and signed their business tax returns and there is therefore no reason for him not to have known no reimbursement was being made with regard to his car. Finally, he had sole use of the vehicle and it shall remain so.
In 1996, the couple was faced with a major tax liability arising from a practice their accountant utilized to defer income. An audit was conducted and they were required to pay $15,000 to resolve all tax issues. That money was borrowed from the inheritance account. Because the tax liability was with regard to returns for businesses in which they were each 50% owners and was assessed for years prior to the 1997 separation and because both partners would individually have been liable had the money not been paid, each is responsible for reimbursement of 50% of the borrowed amount. Mrs. Zander's equity in the realty shall be reduced by $7,850.[12] No interest is applicable.
2. Credit For Educational Expenses
Mrs. Zander volunteered to pay for Magdalen's private schooling in consideration for Mr. Zander paying for Timothy's schooling. She also paid Tim's transportation costs when he traveled from school in Vermont to her home in Massachusetts for visitation. Mrs. Zander considered that an "educational" expense as she considered money she expended for application fees to be educational. Put simply, her argument is that all amounts she paid out for these expenses should be credited against child support arrearages owed — either because she was not under a court order to pay these costs and/or because, had she not used her money in this way, she could have made larger child support payments. Putting aside the fact Magdalen's school expenses were largely paid for by Mrs. Zander' s bartering her services to the school, the wife's obligations to educate her children and pay child support are separate and distinct. The court views this proposal as another attempt to barter. The mother's obligation to educate her child — particularly when, as here, she voluntarily undertook this private school expense — cannot reduce her obligation to pay child support.
ORDERS
CT Page 11707
In entering these orders, the court has considered the statutory requirements set forth in C.G.S. §§ 46b-81, 46b-84, and46b-86, applicable case law, the evidence, the findings, the parites' claims, and their proposed orders. The court has jurisdiction and all statutory stays have expired. The court enters the following orders:
1. The marriage having broken down irretrievably, it is hereby dissolved.
2. The defendant is restored to her maiden name and she shall henceforth be known as Louise Mary Collins.
3. The parties shall have joint legal custody of the three minor children and their physical residence shall be with the father. In view of the pending custody evaluation, this order enters without prejudice. The wife shall have reasonable and flexible visitation to the same degree and on the same schedule as she presently enjoys under a prior agreement. Neither party shall say anything to the children to reduce their esteem for the other and neither will do anything to interfere with a positive relationship by the children with both parents. The plaintiff shall keep the defendant informed of the health, education, and activities of the children.
4. Neither party shall pay alimony to the other.
5. Mr. Zander shall be responsible for his own attorney fees.
6. Each party shall be responsible for the liabilities listed on each of their financial affidavits dated 4/20/99 and each shall indemnify and save harmless the other with regard to those liabilities.
7. Mr. Zander shall be solely responsible for payment of all past due or future state and federal taxes assessed with regard to the business activities of The Artisan's Woodshop, New England Hearth and Soapstone, and New England Hearth and Soapstone, LLC and he shall be solely responsible for any debts incurred in the past or to be incurred in the future with regard to the activities of those companies. He shall indemnify and save harmless the defendant with regard to all of those debts or tax liabilities or any clalms made with regard to those debts, tax liabilities, or the conduct of those businesses. CT Page 11708
8. Mrs. Zander shall be solely responsible for payment of all past due or future state and federal taxes assessed with regard to the company known as Molly Gamblin Music and she shall be solely responsible for any debts incurred in the past or to be incurred in the future with regard to that company's activities. She shall indemnify and save harmless the plaintiff with regard to all of those debts or tax liabilities or any claims arising out of those debts, tax liabilities, or the conduct of that business.
9. The company known as Altera shall be dissolved. Mr. Zander will, within sixty days of the date of this judgment, file all appropriate documents and execute whatever paperwork is required to accomplish the same and Mrs. Zander will cooperate fully in order to effectuate this result. The parties shall equally share the costs involved in this process.
10. The defendant's child support obligation is modified downward to $48.00 per week beginning 11/9/98 and to $56.00 per week effective 8/31/99. Payments to the husband shall be made no less frequently than every two weeks. Child support shall be paid until the youngest child reaches the age of eighteen or graduates from high school, whichever is later, but in no event beyond the child's nineteenth birthday. Child support payments are to be secured by a contingent wage execution.
11. The defendant is ordered to pay, by way of deductions from her equity interest in the realty, past due child support (to include a penalty assessment) in the amount of $2,855 and 50% of the amount borrowed from the inheritance fund — or $7,500.
12. The husband's final equity interest in the realty being $76,295 ($8,100 deposit and $57,840 as 60% remaining equity and $2,855 in back child support and $7,500 as a retum to the inheritance fund) and the wife's final equity interest being $28,205 ($38,560 as 40% of equity after return of deposit minus $2,855 for back child support minus $7,500 for return of tax loan to inheritance fund), the wife shall quitclaim all of her right, title, and interest in the real property at 127 North Street in Goshen to the husband, who shall indemnify and hold her harmless on account of any mortgages, taxes, or other current or past assessments and debts related to that property. The husband will in exchange execute a mortgage deed and note with all of the terms and conditions customarily included in a mortgage from a bank and provide the same to the wife to secure her interest. CT Page 11709 Upon the first to occur of the youngest child reaching the age of eighteen or there being no child under the age of eighteen physically residing in the home or the husband's death or his failure to use the property as his principal place of residence or transfer of the property but in no event more than eight years from the date of judgment, the husband shall pay the wife the sum of $28,205 without interest.
13. For each year in which the wife has an obligation to make child support payments, she shall provide the husband, by no later than August 12 of each year, a profit and loss statement reflecting all of the financial events — to include all income and sales and expenses and acquisitions — pertaining to her music and/or other income generating activities however they then be identified and, by the same date, a complete copy of all personal and business, state and federal income tax returns filed.
14. Should the children no longer be eligible for participation in the Husky Plan and should there be no other program available to them to provide medical coverage, the husband shall maintain a health insurance policy to provide for their medical needs. The parties shall each be 50% responsible for the payment of the premiums on such policy which shall be maintained at least until the youngest child reaches the age of eighteen and thereafter only by agreement of both parties.
15. The parties shall pay equally all unreimbursed medical and dental expenses for the children to include all reasonably incurred medical, dental, hospital, orthodontic, optometric, psychological, and medically prescribed drug expenses on their behalf. The husband shall continue all efforts to seek reimbursement of such medical expenses and shall yearly provide to the defendant an accounting of all requests for payments and payments made together with verification. The intent of this provision is to ensure neither partner is unjustly enriched by payments of unreimbursed expenses by any such source and the husband shall do all that is required to effectuate this result.
16. The husband shall issue the wife a check in the amount of $82.47 (in payment of the amount owed her for unreimbursed medical payments) within fifteen days of the date of judgment.
17. The husband shall be entitled to the tax deduction for Sylva and the wife shall be entitled to the tax deduction for Timothy. The parties will share the tax deduction for Magdalen CT Page 11710 with the husband being entitled to claim Magdalen for the tax year 1999 and in alternate years thereafter.
18. Each party shall be responsible to maintain his or her own health, life, casualty, automobile, or other insurance.
19. The husband shall retain all interest in his businesses — to include all business equipment — free of any claim by the wife and shall indemnify and hold her harmless with regard to any debts or claims regarding the same. He shall be responsible for all past tax obligations with respect to those businesses.
20. The wife shall retain all interest in MGM — to include all business assets — free of any claim by the husband and she shall indemnify and hold him harmless with regard to any debts or claims regarding the same. She shall be responsible for all past tax obligations with respect to the same.
21. Neither party shall retain any right to future profits from income from personal services, sales, freight, or royalties paid to the other's business.
22. The husband shall retain all right, title, and interest in the MGTD and the 1987 Chevy Suburban and the wife shall retain all right, title, and interest in the 1995 Subaru station wagon. Each shall indemnify and save harmless the other with regard to any expenses, obligations, or claims with regard to their ownership of such vehicles.
23. The husband shall, within thirty days of this judgment, provide the wife a duplicate set of all family photographs and a copy of the bill for costs reasonably incurred for such duplication. The wife shall reimburse the husband the full amount for such duplication within thirty days of presentment of the bill.
24. On a date and time and under conditions agreeable to the parties but no later than thirty days from the date of judgment, the husband shall deliver to the wife the antique gathering basket, French cast iron cookpot, and Swedish seal plate. The husband shall retain possession of the refrigerator, gas stove, washer/dryer, two lawn mowers, rototiller, Saladmaster cooking pots, utensils, dishes, chest freezer, 20' wood and canvas canoe, stereo cabinet, and all family photo albums. Except as otherwise here referenced, the parties shall retain all items currently in CT Page 11711 their possession.
Judgment on the complaint will enter in accordance with these orders.
BY THE COURT
Sheedy, J.